FEDERAL TRADE COMMISSION,
Plaintiff,

v.

STAPLES, INC., and Office Depot,
Inc., Defendants.

Civil No. 97-701 (TFH).

United States District Court,
District of Columbia.

June 30, 1997.

George Cary, Melvin Orlans, Bureau of Competition, Washington, DC, for F.T.C.

J. Mark Gidley, Christopher M. Curran, Francis A. Vasquez, Jr., White & Case, Washington, DC, for Staples, Inc.

Donald Kempf, Mark L. Kovner, Kirkland & Ellis, Washington, DC, for Office Depot.

## REDACTED MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), seeks a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to enjoin the consummation of any acquisition by defendant Staples, Inc., of defendant Office Depot, Inc., pending final disposition before the Commission of administrative proceedings to determine whether such acquisition may substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The proposed acquisition has been postponed pending the Court's decision on the motion for a preliminary injunction, which is now before the Court for decision after a five-day evidentiary hearing and the filing of proposed findings of fact and conclusions of law. For the reasons set forth below, the Court will grant the plaintiff's motion. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

## BACKGROUND

The FTC is an administrative agency of the United States organized and existing pursuant to the Federal Trade Commission Act, 15 U.S.C. §§ 41–77. The Commission is responsible, *inter alia,* for enforcing federal antitrust laws particularly Section 7 of the Clayton Act and Sections 5 and 13(b) of the Federal Trade Commission Act.

Defendants are both corporations which sell office products—including office supplies, business machines, computers and furniture—through retail stores, commonly described as office supply superstores, as well as through direct mail delivery and contract stationer operations. Staples is the second largest office superstore chain in the United States with approximately 550 retail stores located in 28 states and the District of Columbia, primarily in the Northeast and California. In 1996 Staples' revenues from those stores were approximately $4 billion through all operations. Office Depot, the largest office superstore chain, operates over 500 retail office supply superstores that are located in 38 states and the District of Columbia, primarily in the South and Midwest. Office Depot's 1996 sales were approximately $6.1 billion. OfficeMax, Inc., is the only other office supply superstore firm in the United States.

On September 4, 1996, defendants Staples and Office Depot, and Marlin Acquisition Corp. ("Marlin"), a wholly-owned subsidiary of Staples, entered into an "Agreement and Plan of Merger" whereby Marlin would merge with and into Office Depot, and Office Depot would become a wholly-owned subsidiary of Staples. According to the Agreement and Plan of Merger, the transaction would be structured as a pooling of interests, in which each share of Office Depot common stock would be exchanged for 1.14 shares of Sta-

ples' common stock. Pursuant to the Hart–Scott–Rodino Improvements Act of 1976, 15 U.S.C. § 18a, Staples and Office Depot filed a Premerger Notification and Report Form with the FTC and Department of Justice on October 2, 1996. This was followed by a seven month investigation by the FTC. The FTC issued a Second Request for Information on November 1, 1996, to both Staples and' Office Depot. The Commission further initiated a second Second Request on January 10, 1997. In addition to the hundreds of boxes of documents produced to the FTC during this time, the FTC took depositions of 18 Staples and Office Depot officers and employees. The FTC also undertook extensive *ex parte* discovery of third-party documents and, in lieu of subpoenas, obtained at least 36 declarations from third parties.

On March 10, 1997, the Commission voted 4–1 to challenge the merger and authorized commencement of an action under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to seek a temporary restraining order and a preliminary injunction barring the merger. Following this vote, the defendants and the FTC staff negotiated a consent decree that would have authorized the merger to proceed on the condition that Staples and Office Depot sell 63 stores to OfficeMax. However, the Commission voted 3–2 to reject the proposed consent decree on April 4, 1997. The FTC then filed this suit on April 9, 1997, seeking a temporary retraining order and preliminary injunction against the merger pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), pending the completion of an administrative proceeding pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 12, 21.

Because of the urgency of this matter, the Court authorized expedited discovery and held a five-day evidentiary hearing beginning on May 19, 1997. Closing arguments were

heard on June 5, 1997. In the meantime, the defendants agreed to postpone the merger pending the Court's decision on the motion for a preliminary injunction, thus making the plaintiff's motion for a temporary restraining order moot. At the hearing, the FTC called a number of live witnesses, including three industry witnesses and two economic experts, Dr. Frederick R. Warren–Boulton and Dr. Orley Ashenfelter. Defendants offered testimony from eight live witnesses, including one economic expert, Dr. Jerry Hausman, as well as an expert in retailing, Maurice Segall. In addition to these live witnesses, the plaintiff and the defendants combined submitted over six thousand exhibits including declarations from consumers, industry analysts, economic experts, suppliers, and other sellers of office supplies. Following the conclusion of the hearing, nine states filed a joint amicus brief in support of the FTC's motion.[1]

## DISCUSSION

### I. Section 13(B) Standard for Preliminary Injunctive Relief

■ Section 7 of the Clayton Act, 15 U.S.C. § 18, makes it illegal for two companies to merge "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Whenever the Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act, the FTC may seek a preliminary injunction to prevent a merger pending the Commission's administrative adjudication of the merger's legality. *See* Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b). However, in a suit for preliminary relief, the FTC is not required to prove, nor is the Court required to find, that the proposed merger would in fact violate Section 7 of the Clayton Act. *FTC v. Alliant Techsystems Inc.*, 808 F.Supp. 9, 19 (D.D.C.1992),

---

1. The amicus brief filed by the states was unusual due to its inclusion of a declaration of an expert witness employed by the states. The Court read and considered the states' amicus brief. However, the Court did not rely on the declaration of Douglas F. Greer in any way in reaching its decision. Dr. Greer's declaration was submitted to the Court following the hearing. Thus, neither party had the opportunity for meaningful cross-examination of Dr. Greer. In fairness to the parties, therefore, the Court wishes to make it clear that the Court did not use or rely on Dr. Greer's declaration in reaching this decision.

*FTC v. PPG Indus.*, 628 F.Supp. 881, 883, n. 3 (D.D.C.), *aff'd in part rev'd in part,* 798 F.2d 1500 (D.C.Cir.1986). The determination of whether the acquisition actually violates the antitrust laws is reserved for the Commission and is, therefore, not before this Court. *See Alliant,* 808 F.Supp. at 19. The only question before this Court is whether the FTC has made a showing which justifies preliminary injunctive relief.

Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), provides that "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond"[2] Courts have interpreted this to mean that a court must engage in a two-part analysis in determining whether to grant an injunction under section 13(b). (1) First, the Court must determine the Commission's likelihood of success on the merits in its case under Section 7 of the Clayton Act, and (2) Second, the Court must balance the equities. *See FTC v. Freeman Hospital,* 69 F.3d 260, 267 (8th Cir. 1995), *FTC v. University Health, Inc.,* 938 F.2d 1206, 1217–18 (11th Cir.1991), *FTC v. Warner Communications Inc.,* 742 F.2d 1156, 1160 (9th Cir.1984); *FTC v. Occidental Petroleum Corp.,* 1986–1 Trade Cases ¶ 67.071, 1986 WL 952 (D.D.C.1986).

## A. Likelihood of Success on the Merits

■ Likelihood of success on the merits in cases such as this means the likelihood that the Commission will succeed in proving, after a full administrative trial on the merits, that the effect of a merger between Staples and Office Depot "may be substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act. The Commission satisfies its burden to show likelihood of success if it "raises questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the Commission in the first instance and ultimately by the Court of Appeals." *FTC v. University Health, Inc.,* 938 F.2d 1206, 1218 (11th Cir. 1991) ("To show a likelihood of ultimate success, the FTC must 'raise [ ] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals' "). *FTC v. Warner Communications, Inc.,* 742 F.2d 1156, 1162 (9th Cir.1984) ("The Commission meets its burden if it 'raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals' "), *FTC v. National Tea Co.,* 603 F.2d 694, 698 (8th Cir.1979) (same language); *FTC v. Alliant Techsystems Inc.,* 808 F.Supp. 9, 19 (D.D.C.1992) (same language). *See also FTC v. Beatrice Foods Company,* 587 F.2d 1225 (D.C.Cir. 1978).[3]

---

**2.** The traditional "irreparable harm" element is absent from the Section 13(b) standard. In this respect, the section 13(b) standard is "lesser" than that which courts normally impose on private litigants seeking a preliminary injunction.

**3.** The only time the D.C. Circuit has addressed the FTC's burden under Section 13(b) was in *Beatrice Foods* where Judges MacKinnon and Robb wrote:

The appropriate definition of the Commission's burden under Section 13(b) was articulated in *FTC v. Lancaster Colony Corp.,* 434 F.Supp. 1088, 1090 (S.D.N.Y.1977), where the court held that "the FTC meets its burden on the 'likelihood of success' issue if it shows preliminarily, by affidavits or other proof, that *it has a fair and tenable chance of ultimate success on the merits."* It amplified this standard by stat-

ing that, if the FTC makes the requisite showing on the equities a preliminary injunction should issue *if the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals. Id.* at 1229 (emphasis added).

Defendants argued in their briefs that the Court may not rely on *Beatrice Foods* as precedent because it is a memorandum opinion appended to the statements of Judges MacKinnon and Robb explaining their votes on a motion for rehearing en banc. Judge Revercomb reached this same conclusion in *FTC v. Occidental Petroleum Corp.,* 1986–1 Trade Cases ¶ 67,071, 1986 WL 952 (D.D.C.1986), *vacated,* No. 86–5254 (D.C.Cir. Oct. 23, 1986), where he found that

■ It is not enough for the FTC to show merely that it has a "fair and tenable chance" of ultimate success on the merits as has been argued and rejected in other cases. *See FTC v. Freeman Hospital,* 69 F.3d 260, 267 (8th Cir.1995) (rejecting the Commission's argument that it need only show a "fair and tenable chance of ultimate success on the merits" in order to qualify for injunctive relief because such a standard would run contrary to Congressional intent and reduce the judicial function to a mere "rubber stamp" of the FTC's decisions.) *See also FTC v. National Tea Co.,* 603 F.2d 694, 698 (8th Cir.1979) (reaching the same conclusions under the same reasoning).[4] However, the FTC need not prove to a certainty that the merger will have an anti-competitive effect. That is a question left to the Commission after a full administrative hearing. Instead, in a suit for a preliminary injunction, the government need only show that there is a "reasonable probability" that the challenged transaction will substantially impair competition. *FTC v. University Health,* 938 F.2d 1206, 1218 (11th Cir.1991) ("[T]he government must show a reasonable probability that the proposed transaction would substantially lessen competition in the future"), *Fruehauf Corp. v. FTC,* 603 F.2d 345, 351 (2d Cir.1979) ("There must be 'the reasonable probability' of a substantial impairment of competition to render a merger illegal"). *See also United States v. Penn–Olin Chemical Co.,* 378 U.S. 158, 171, 84 S.Ct. 1710, 1717, 12

L.Ed.2d 775 (1964) ("The requirements of [Section 7] are satisfied when a tendency toward monopoly of the reasonable likelihood of a substantial lessening of competition in the relevant market is shown"). *FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. 84, 86 (N.D.Ill.1981) ("The government must prove not that the merger in question may possibly have an anti-competitive effect, but rather that it will probably have such as effect.").

■ In order to determine whether the Commission has met its burden with respect to showing its likelihood of success on the merits, that is, whether the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals and that there is a "reasonable probability" that the challenged transaction will substantially impair competition, the Court must consider the likely competitive effects of the merger, if any. Analysis of the likely competitive effects of a merger requires determinations of (1) the "line of commerce" or product market in which to assess the transaction, (2) the "section of the country" or geographic market in which to assess the transaction, and (3) the transaction's probable effect on competition in the product and geographic markets. *See United States v. Marine Bancorporation,*

Beatrice Foods could not be cited as precedent under the Local Rules, and, in fact, the FTC agrees that the opinion is technically "unpublished" even though it appears in the Federal Reporter, 2d Series. For these reasons, the Court has not relied on *Beatrice Foods* as precedent. Instead, the Court cites it only because it contains language identical to that from other circuits, and the discussion would be incomplete without mention of the case.

4. It is clear that the defendants' primary objection to the *Beatrice Foods* case is the "fair and tenable chance" language contained in that opinion. For the reasons expressed in the *Freeman* and *National Tea* opinions, the Court finds that the defendants are correct that a "fair and tenable chance" of ultimate success on the merits is not the proper burden in this case. In addition, there is no case identified by either party which specifically holds that a "fair and tenable chance" of ultimate success on the merits is the proper standard. It is not clear that *Beatrice Foods* even supports such a conclusion. The

"fair and tenable chance" language present in *Beatrice Foods* is followed by what the court describes as an "amplification" which provides a more stringent standard. *Beatrice Foods,* 587 F.2d at 1229.

To be fair to the plaintiff on this issue, the Court believes that the defendants misunderstood the FTC's argument with regard to the "fair and tenable chance" language in *Beatrice Foods,* and that the FTC did not in fact argue that a "fair and tenable chance" was the appropriate burden in this case. Rather, the FTC's citation of *Beatrice Foods* was to the later part of that opinion in which Judges MacKinnon and Robb wrote that a preliminary injunction should issue if the FTC has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."

418 U.S. 602, 618–23, 94 S.Ct. 2856, 2868–71, 41 L.Ed.2d 978 (1974), *FTC v. Harbour Group Investments, L.P.*, 1990–2 Trade Cas (CCH) ¶ 69,247 at 64,914 n. 3, 1990 WL 198819 (D.D.C.1990).

## II. The Geographic Market

■ One of the few issue about which the parties to this case do not disagree is that metropolitan areas are the appropriate geographic markets for analyzing the competitive effects of the proposed merger. A geographic market is that geographic area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendant faces competition." *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir.1994), *cert. denied*, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995). In its first amended complaint, the FTC identified forty-two such metropolitan areas [5] as well as future areas which could suffer anti-competitive effects from the proposed merger.[6] Defendants have not challenged the FTC's geographic market definition in this proceeding. Therefore, the Court will accept the relevant geographic markets identified by the Commission.

## III. The Relevant Product Market

In contrast to the parties' agreement with respect to the relevant geographic market,

the Commission and the defendants sharply disagree with respect to the appropriate definition of the relevant product market or line of commerce. As with many antitrust cases, the definition of the relevant product market in this case is crucial. In fact, to a great extent, this case hinges on the proper definition of the relevant product market.

The Commission defines the relevant product market as "the sale of consumable office supplies through office superstores," [7] with "consumable" meaning products that consumers buy recurrently, i.e., items which "get used up" or discarded. For example, under the Commission's definition, "consumable office supplies" would not include capital goods such as computers, fax machines, and other business machines or office furniture, but does include such products as paper, pens, file folders, post-it notes, computer disks, and toner cartridges. The defendants characterize the FTC's product market definition as "contrived" with no basis in law or fact, and counter that the appropriate product market within which to assess the likely competitive consequences of a Staples–Office Depot combination is simply the overall sale of office products, of which a combined Staples–Office Depot accounted for 5.5% of total sales in North America in 1996. In addition,

**5.** According to the FTC, the proposed merger would have an anti-competitive effect in the following geographic markets:

(1) in Salinas, California, San Diego, California, Visalia–Tulare–Porterville, California, Lakeland–Winter Haven, Florida, Ocala, Florida, Tampa–St. Petersburg–Clearwater, Florida, Fort Pierce–Port St. Lucie, Florida, Champaign–Urbana, Illinois, Louisville, Kentucky, Baltimore, Maryland, Greenville, North Carolina, Florence, South Carolina, Charlottesville, Virginia, Washington, D.C., and Spokane, Washington, where the number of office superstore firms would drop from two to one.

(2) in Los Angeles, California, Sacramento, California, San Francisco–Oakland–San Jose, California, Stockton–Lodi, California, Orlando, Florida, Sarasota–Bradenton, Florida, West Palm Beach–Boca Raton, Florida, Evansville, Indiana, Indianapolis, Indiana, South Bend, Indiana, Springfield, Illinois, Kalamazoo–Battle Creek, Michigan, Detroit–Ann Arbor–Flint, Michigan, Grand Rapids–Muskegon–Holland, Michigan, Middlesex County, New Jersey, Passaic County, New Jersey, Nassau–Suffolk, New York,

Greensborough–Winston Salem–High Point, North Carolina, Raleigh–Durham, North Carolina, Cleveland, Ohio, Cincinnati–Hamilton, Ohio, Portland–Vancouver, Oregon–Washington, Pittsburgh, Pennsylvania, Columbia, South Carolina, Chattanooga, Tennessee, Nashville, Tennessee, and Salt Lake City–Ogden, Utah, where the number of superstore firms will be reduced from three to two.

**6.** Metropolitan areas where Staples and Office Depot would have competed in the future include Bergen County, New Jersey, Fayetteville, North Carolina, Albany–Schenectady–Troy, New York, and Fredericksburg, Virginia, where Office Depot plans to open stores in Staples markets before the end of 1997. In addition, Staples predicted that it would face competition from Office Depot in 76% of its markets by the year 2000, compared to the 46% overlap between the two companies in 1996.

**7.** The Commission also offered an alternative product market, that of the sale of consumable office supplies through retail stores to small businesses and individuals with home offices.

the defendants argue that the challenged combination is not likely "substantially to lessen competition" however the product market is defined. After considering the arguments on both sides and all of the evidence in this case and making evaluations of each witness's credibility as well as the weight that the Court should give certain evidence and testimony, the Court finds that the appropriate relevant product market definition in this case is, as the Commission has argued, the sale of consumable office supplies through office supply superstores.

■ The general rule when determining a relevant product market is that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962); *see also United States v. E.I. du Pont de Nemours and Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007–08, 100 L.Ed. 1264 (1956). Interchangeability of use and cross-elasticity of demand look to the availability of substitute commodities, i.e. whether there are other products offered to consumers which are similar in character or use to the product or products in question, as well as how far buyers will go to substitute one commodity for another. *E.I. du Pont de Nemours,* 351 U.S. at 393, 76 S.Ct. at 1006. In other words, the general question is "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other." *Hayden Pub. Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 70 n.8 (2d Cir.1984).

■ Whether there are other products available to consumers which are similar in character or use to the products in question may be termed "functional interchangeability." *See, e.g., E.I. du Pont de Nemours,* 351 U.S. at 399, 76 S.Ct. at 1009 (recognizing "functional interchangeability" between cellophane and other flexible wrappings). *United States v. Archer–Daniels–Midland Co.,* 866 F.2d 242, 246 (8th Cir.1988) (discussing "functional interchangeability" between sugar and high fructose corn syrup), *cert. de-*

*nied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). This case, of course, is an example of perfect "functional interchangeability." The consumable office products at issue here are identical whether they are sold by Staples or Office Depot or another seller of office supplies. A legal pad sold by Staples or Office Depot is "functionally interchangeable" with a legal pad sold by Wal–Mart. A post-it note sold by Staples or Office Depot is "functionally interchangeable" with a post-it note sold by Viking or Quill. A computer disk sold by Staples–Office Depot is "functionally interchangeable" with a computer disk sold by CompUSA. No one disputes the functional interchangeability of consumable office supplies. However, as the government has argued, functional interchangeability should not end the Court's analysis.

The Supreme Court did not stop after finding a high degree of functional interchangeability between cellophane and other wrapping materials in the *E.I. du Pont de Nemours* case. Instead, the Court also found that "an element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other." *Id.* at 400, 76 S.Ct. at 1010. For example, in that case, the Court explained, "[i]f a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between [cellophane and other flexible wrappings], [and therefore] that the products compete in the same market." *Id.* Following that reasoning in this case, the Commission has argued that a slight but significant increase in Staples–Office Depot's prices will not cause a considerable number of Staples–Office Depot's customers to purchase consumable office supplies from other non-superstore alternatives such as Wal–Mart, Best Buy, Quill, or Viking. On the other hand, the Commission has argued that an increase in price by Staples would result in consumers turning to another office superstore, especially Office Depot, if the consumers had that option. Therefore, the Commission concludes that the sale of consumable office supplies by

office supply superstores is the appropriate relevant product market in this case, and products sold by competitors such as Wal-Mart, Best Buy, Viking, Quill, and others should be excluded.

The Court recognizes that it is difficult to overcome the first blush or initial gut reaction of many people to the definition of the relevant product market as the sale of consumable office supplies through office supply superstores. The products in question are undeniably the same no matter who sells them, and no one denies that many different types of retailers sell these products. After all, a combined Staples–Office Depot would only have a 5.5% share of the overall market in consumable office supplies. Therefore, it is logical to conclude that, of course, all these retailers compete, and that if a combined Staples–Office Depot raised prices after the merger, or at least did not lower them as much as they would have as separate companies, that consumers, with such a plethora of options, would shop elsewhere.

The Court acknowledges that there is, in fact, a broad market encompassing the sale of consumable office supplies by all sellers of such supplies, and that those sellers must, at some level, compete with one another. However, the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes. The Supreme Court has recognized that within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962), *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir.1986) (Bork, J.), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). With respect to such submarkets, the Court explained "[b]ecause Section 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in any line of commerce,' it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." *Id.* There is a possibility, therefore, that the sale of consumable office supplies by office superstores may qualify as a submarket within a larger market of retailers of office supplies in general.

The Court in *Brown Shoe* provided a series of factors or "practical indicia" for determining whether a submarket exists including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* Since the Court described these factors as "practical indicia" rather than requirements, subsequent cases have found that submarkets can exist even if only some of these factors are present. *See, e.g., Beatrice Foods Co. v. FTC,* 540 F.2d 303 (7th Cir.1976) (finding submarket based on industry recognition, peculiar characteristics of the product, and differences in production methods and prices). *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913, 932 (9th Cir. 1975) (explaining that *Brown Shoe's* practical indicia were meant as "practical aids rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue").

The Commission discussed several of the *Brown Shoe* "practical indicia" in its case, such as industry recognition, and the special characteristics of superstores which make them different from other sellers of office supplies, including distinct formats, customers, and prices. Primarily, however, the FTC focused on what it termed the "pricing evidence," which the Court finds corresponds with *Brown Shoe's* "sensitivity to price changes" factor. First, the FTC presented evidence comparing Staples' prices in geographic markets where Staples is the only office superstore, to markets where Staples competes with Office Depot or OfficeMax, or both. Based on the FTC's calculations, in markets where Staples faces no office superstore competition at all, something which was termed a one firm market during the hear-

ing, prices are 13% higher than in three firm markets where it competes with both Office Depot and OfficeMax. The data which underly this conclusion make it compelling evidence. Prices were compared as of January 1997, which, admittedly, only provides data for one specific point in time. However, rather than comparing prices from only a small sampling or "basket" of goods, the FTC used an office supply sample accounting for 90% of Staples' sales and comprised of both price sensitive and non price sensitive items. The FTC presented similar evidence based on Office Depot's prices of a sample of 500 items, also as of January 1997. Similarly, the evidence showed that Office Depot's prices are significantly higher—well over 5% higher,[8] in Depot-only markets than they are in three firm markets.

Other pricing evidence presented by the FTC is less convincing on its own, due to limitations in the underlying data. For example, relatively small samplings or "baskets" of goods may have been used or it may not be clear how many stock keeping units ("SKUs") of supplies were included. For example, the FTC also presented evidence comparing Staples' prices in Staples-only markets with Staples' prices in three-firm markets for four different time periods, August 1994, January 1995, August 1995, and May 1996. The result is startlingly similar to that found in the first two examples. Where Staples does not compete with other office superstores, it charges prices well over 5% higher than where it does so compete. While having the advantage of showing a trend over time, the Court recognizes that this evidence has some problems. These particular calculations were made based on a "basket" or sample of supplies comprised of supplies used by Staples to price check against Office Depot. The number of SKUs in the sample was not provided to the Court,

and it appears that the components of the baskets may have changed over time. Therefore, the Court would not give much weight to this evidence standing alone. However, since additional evidence supports the same conclusion, the Court credits this evidence as confirmation of the general pricing trend.

The FTC also pointed to internal Staples documents which present price comparisons between Staples' prices and Office Depot's prices and Staples' prices and OfficeMax's prices within different price zones.[9] The comparisons between Staples and Office Depot were made in August 1994, January 1995, August 1995, and May 1996. Staples' prices were compared with OfficeMax's prices in August 1994, July 1995, and January 1996. For each comparison, Staples calculations were based on a fairly large "basket" or sample of goods, approximately 2000 SKUs containing both price sensitive and non-price sensitive items. Using Staples' data, but organizing it differently to show which of those zones were one, two, or three firm markets, the FTC showed once again that Staples charges significantly higher prices, more than 5% higher, where it has no office superstore competition than where it competes with the two other superstores.

The FTC offered similar price comparison evidence for Office Depot, comparing Office Depot's prices across Staples' zones. The comparisons were made in August 1994, January 1995, August 1995, and May 1996. Again, a large sample, approximately 2000 SKUs, was considered. The results of this analysis are slightly less favorable to the FTC's position. Price differentials are significantly smaller and there are even a few instances where Office Depot's prices appear to be higher in one of its three firm markets than prices in its two firm markets and at least one point where prices in one of the

8. The analytical framework set forth in the *Merger Guidelines* approaches the inquiry regarding the reasonable interchangeability of use or cross-elasticity of demand by asking whether a "hypothetical monopolist would profitably impose at least a 'small but significant and nontransitory' [price] increase." *Merger Guidelines* at § 111. The *Merger Guidelines* use 5% of the usual approximation of a "small but significant and non-transatory price increase." *Id.* For this reason,

the Court's analysis will often refer to this 5% number.

9. It was established at the hearing that Staples and Office Depot do not maintain nationally uniform prices in their stores. Instead, both companies currently organize their stores into price zones which are simply groups of one or more stores that have common prices.

Depot-only zones were lower than prices in one of the three firm markets. On average, however, this evidence shows that Office Depot's prices are highest in its one firm markets, and lowest in its three firm markets.

This evidence all suggests that office superstore prices are affected primarily by other office superstores and not by non-superstore competitors such as mass merchandisers like Wal–Mart, Kmart, or Target, wholesale clubs such as BJ's, Sam's, and Price Costco, computer or electronic stores such as Computer City and Best Buy, independent retail office supply stores, mail orders firms like Quill and Viking, and contract stationers. Though the FTC did not present the Court with evidence regarding the precise amount of non-superstore competition in each of Staples' and Office Depot's one, two, and three firm markets, it is clear to the Court that these competitors, albeit in different combinations and concentrations, are present in every one of these markets. For example, it is a certainty that the mail order competitors compete in all of the geographic markets at issue in this case. Office products are available through the mail in all 50 states, and have been for approximately 30 years. Despite this mail order competition, however, Staples and Office Depot are still able to charge higher prices in their one firm markets than they do in the two firm markets and the three firm markets without losing a significant number of customers to the mail order firms. The same appears to be true with respect to Wal–Mart. Bill Long, Vice President for Merchandising at Wal–Mart Stores, testifying through declaration, explained that price-checking by Wal–Mart of Staples' prices in areas where both Staples and Wal–Mart exist showed that, on average, Staples' prices were higher where there was a Staples and a Wal–Mart but no other superstore than where there was a Staples, a Wal–Mart, and another superstore.[10]

The evidence with respect to the wholesale club stores is consistent. Mike Atkinson, Vice President, Division Merchandise Manager of BJ's Wholesale Club, testified at the hearing regarding BJ's price checking of Staples and Office Depot in areas where BJ's competes with one or both of those superstores. Though his sample was small—he testified that less than 10% of BJ's 80 stores are located in the same area as a Staples and/or Office Depot—BJ's price checking found that, in general, office supply superstore prices were lowest where there was both a Staples and an Office Depot. In addition, Staples' own pricing information shows that warehouse clubs have very little effect on Staples' prices. For example, Staples' maintains a "warehouse club only" price zone, which indicates a zone where Staples exists with a warehouse club but without another office superstore. The data presented by the Commission on Staples' pricing shows only a slight variation in prices (1%–2%) between "warehouse club only" zones and one superstore markets without a warehouse club. Additionally, in May 1996, two price comparison studies done by Staples, first using 2,084 SKUs including both price sensitive and non-price sensitive items and then using only 244 SKUs of price sensitive items, showed that prices in the "club only" zones, on average, were over 10% higher than in zones where Staples competes with Office Depot and/or OfficeMax.

There is also consistent evidence with respect to computer and/or consumer electronics stores such as Best Buy. For example, Office Depot maintains a separate price zone, which it calls "zone 30," for areas with Best Buy locations but no other office supply superstores. However, the FTC introduced evidence, based on a January 1997 market basket of "top 500 items by velocity," that prices in Office Depot's "zone 30" price zone are almost as high as in its "non-competitive" price zone, the zone where it does not compete with another office superstore.

There is similar evidence with respect to the defendants' behavior when faced with entry of another competitor. The evidence shows that the defendants change their price

---

**10.** As the defendants pointed out and criticized during the hearing, Mr. Long submitted several declarations and/or revised declarations in which he modified portions of his declaration. However, his testimony remained unchanged on this particular issue. Therefore, the Court credited this particular testimony.

zones when faced with entry of another superstore, but do not do so for other retailers. For example, Staples changed its price zone for Cincinnati to a lower priced zone when Office Depot and OfficeMax entered that area. New entry by Staples and OfficeMax caused a decline in prices at Office Depot's Greensboro stores. In July 1996, after OfficeMax entered Jackson, Michigan, Staples moved its Jackson store to a new zone, cutting prices by 6%. There are numerous additional examples of zones being changed and prices falling as a result of superstore entry. There is no evidence that zones change and prices fall when another non-superstore retailer enters a geographic market.

■ Though individually the FTC's evidence can be criticized for looking at only brief snapshots in time or for considering only a limited number of SKUs, taken together, however, the Court finds this evidence a compelling showing that a small but significant increase in Staples' prices will not cause a significant number of consumers to turn to non-superstore alternatives for purchasing their consumable office supplies. Despite the high degree of functional interchangeability between consumable office supplies sold by the office superstores and other retailers of office supplies, the evidence presented by the Commission shows that even where Staples and Office Depot charge higher prices, certain consumers do not go elsewhere for their supplies. This further demonstrates that the sale of office supplies by non-superstore retailers are not responsive to the higher prices charged by Staples and Office Depot in the one firm markets. This indicates a low cross-elasticity of demand between the consumable office supplies sold by the superstores and those sold by other sellers.

Turning back to the other *Brown Shoe* "practical indicia" of submarkets that the Commission offered in this case, the Commission presented and the Court heard a great deal of testimony at the hearing and through declarations about the uniqueness of office superstores and the differences between the office superstores and other sellers of office supplies such as mass merchandisers, wholesale clubs, and mail order firms as well as the special characteristics of office superstore customers. In addition, the Court was asked to go and view many of the different types of retail formats. That evidence shows that office superstores are, in fact, very different in appearance, physical size, format, the number and variety of SKU's offered, and the type of customers targeted and served than other sellers of office supplies.

The Court has observed that office supply superstores look far different from other sellers of office supplies. Office supply superstores are high volume, discount office supply chain stores averaging in excess of 20,000 square feet, with over 11,000 of those square feet devoted to traditional office supplies, and carrying over 5,000 SKUs of consumable office supplies in addition to computers, office furniture, and other non-consumables. In contrast, stores such as Kmart devote approximately 210 square feet to the sale of approximately 250 SKUs of consumable office supplies. Kinko's devotes approximately 50 square feet to the sale of 150 SKUs. Target sells only 400 SKUs. Both Sam's Club and Computer City each sell approximately 200 SKUs. Even if these SKU totals are low estimates as the defendants have argued, there is still a huge difference between the superstores and the rest of the office supply sellers.

In addition to the differences in SKU numbers and variety, the superstores are different from many other sellers of office supplies due to the type of customer they target and attract. The superstores' customer base overwhelmingly consists of small businesses with fewer than 20 employees and consumers with home offices. In contrast, mail order customers are typically mid-sized companies with more than 20 employees. Another example is contract stationers who focus on serving customers with more than 100 employees. While the Court accepts that some small businesses with fewer than 20 employees as well as home office customers do choose other sellers of office supplies, the superstores' customers are different from those of many of the purported competitors.

■ It is difficult to fully articulate and explain all of the ways in which superstores are unique. As the plaintiff and defendant requested, the Court viewed some of the various sellers of office supplies located in the Rockville, Maryland area, including Staples, Office Depot, CompUSA, Best Buy, CVS, Kmart, Giant Food, and Wal–Mart. Based on the Court's observations, the Court finds that the unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers. Other retailers devote only a fraction of their square footage to office supplies as opposed to Staples or Office Depot. The evidence shows that the typical club, mass merchant, or computer store offers only 210 to 2000 square feet of office supplies, compared to over 11,182 square feet at a typical Staples. This was evident to the Court when visiting the various stores. Superstores are simply different in scale and appearance from the other retailers. No one entering a Wal–Mart would mistake it for an office superstore. No one entering Staples or Office Depot would mistakenly think he or she was in Best Buy or CompUSA. You certainly know an office superstore when you see one. *Cf. Bon–Ton Stores, Inc. v. May Department Stores*, 881 F.Supp. 860, 870 (W.D.N.Y.1994) ("Customers know a department store when they see it.")

Another of the "practical indicia" for determining the presence of a submarket suggested by *Brown Shoe* is "industry or public recognition of the submarket as a separate economic entity." *See also Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210, 219 (D.C.Cir.1986) (Bork, J.) ("The industry or public recognition of the submarket as a separate economic unit matters because we assume that economic actors usually have accurate perceptions of economic realities."), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). *FTC v. Coca–Cola Co.*, 641 F.Supp. 1128, 1132 (D.D.C.1986) ("Analysis of the market is a matter of business reality—a matter of how the market is perceived by those who strive for profit in it"), *vacated as moot*, 829 F.2d 191 (D.C.Cir.1987). The Commission offered abundant evidence on this factor from Staples' and Office De-

pot's documents which shows that both Staples and Office Depot focus primarily on competition from other superstores. The documents reviewed by the Court show that the merging parties evaluate their "competition" as the other office superstore firms, without reference to other retailers, mail order firms, or independent stationers. In document after document, the parties refer to, discuss, and make business decisions based upon the assumption that "competition" refers to other office superstores only. For example, Staples uses the phrase "office superstore industry" in strategic planning documents. PX 15 at 3186. Staples' 1996 Strategy Update refers to the "Big Three" and "improved relative competitive position" since 1993 and states that Staples is "increasingly recognized as [the] industry leader." PX 15 at 3153. A document analyzing a possible acquisition of OfficeMax referenced the "[b]enefits from pricing in [newly] non-competitive markets," and also the fact that there was "a potential margin lift overall as the industry moves to 2 players." PX 33 at 8393, 8399.

When assessing key trends and making long range plans, Staples and Office Depot focus on the plans of other superstores. In addition, when determining whether to enter a new metropolitan area, both Staples and Office Depot evaluate the extent of office superstore competition in the market and the number of office superstores the market can support. When selecting sites and markets for new store openings, defendants repeatedly refer to markets without office superstores as "non-competitive," even when the new store is adjacent to or near a warehouse club, consumer electronics store, or a mass merchandiser such as Wal–Mart. In a monthly report entitled "Competitor Store Opening/Closing Report" which Office Depot circulates to its Executive Committee, Office Depot notes all competitor store closings and openings, but the only competitors referred to for its United States stores are Staples and OfficeMax. PX 75 at 1309.

■ While it is clear to the Court that Staples and Office Depot do not ignore sellers such as warehouse clubs, Best Buy, or Wal–Mart, the evidence clearly shows that

Staples and Office Depot each consider the other superstores as the primary competition. For example, Office Depot has a Best Buy zone and Staples has a warehouse club zone. However, each still refers to its one firm markets with no other office superstore as "non-competitive" zones or markets. In addition, it is clear from the evidence that Staples and Office Depot price check the other office superstores much more frequently and extensively than they price check other retailers such as BJ's or Best Buy, and that Staples and Office Depot are more concerned with keeping their prices in parity with the other office superstores in their geographic areas than in undercutting Best Buy or a warehouse club.

For the reasons set forth in the above analysis, the Court finds that the sale of consumable office supplies through office supply superstores is the appropriate relevant product market for purposes of considering the possible anti-competitive effects of the proposed merger between Staples and Office Depot. The pricing evidence indicates a low cross-elasticity of demand between consumable office products sold by Staples or Office Depot and those same products sold by other sellers of office supplies. This same evidence indicates that non-superstore sellers of office supplies are not able to effectively constrain the superstores prices, because a significant number of superstore customers do not turn to a non-superstore alternative when faced with higher prices in the one firm markets. In addition, the factors or "practical indicia" of *Brown Shoe* support a finding of a "submarket" under the facts of this case, and "submarkets," as *Brown Shoe* established, may themselves be appropriate product markets for antitrust purposes. 370 U.S. at 325, 82 S.Ct. at 1523–24.[11]

This Court is not the first to find a narrower submarket or relevant product market within a larger market. Judge Larimer found one in *Bon–Ton Stores, Inc. v. May*

*Department Stores Co.*, 881 F.Supp. 860 (W.D.N.Y.1994), when he defined the relevant product market in that case as "traditional department stores including J.C. Penney's." Defendants had argued that the "traditional department stores" definition was underinclusive because it overlooked numerous businesses that compete with department stores. *Id.* at 865. Under the defendants' view, the relevant product market should have included all stores selling general merchandise, apparel, and furniture. *Id.* The court acknowledged that, in a broad sense, traditional department stores do compete in a vast marketplace encompassing retailers in general. *Id.* at 868. However, applying the *Brown Shoe* "practical idicia," the court found that there were qualitative differences between traditional department stores and other retailers, including the physical appearance and layout of the stores, distinctive customers, the wide range of brand-name merchandise, and service. *Id.* at 869–72. Additionally, the court found that testimony at the hearing as well as internal company documents indicated that the department stores themselves recognize each other as competitors different from other retailers. *Id.* at 873. The court found that this evidence established that "traditional department stores including J.C. Penney's" constituted a proper submarket under the *Brown Shoe* criteria. *Id.* at 874. The court enjoined the merger. *Id.* at 878.

A similar, though not as detailed, analysis was undertaken in *State of California v. American Stores Co.*, 697 F.Supp. 1125 (C.D.Ca.1988), aff'd in part and rev'd in part on other grounds, 872 F.2d 837 (9th Cir. 1989), rev'd on other grounds, 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990). In that case, the State of California brought an action to enjoin the merger of two supermarket chains. *Id.* at 1127. The State defined the relevant product market as "supermarkets—full line grocery stores with more than

---

11. As other courts have noted, use of the term "submarket" may be confusing. *See Allen–Myland v. IBM Corp.*, 33 F.3d 194, 208 n. 16 (3rd Cir.1994) (finding it less confusing to speak in terms of the relevant product market rather than the submarket), cert. denied, 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994). *Olin Corp. v.*

*FTC*, 986 F.2d 1295, 1299 (9th Cir.1993) ("[E]very market that encompasses less than all products is, in a sense, a submarket"), cert. denied, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994). Whatever term is used—market, submarket, relevant product market—the analysis is the same.

10,000 square feet." *Id.* at 1129. In contrast, defendants contended that the relevant product market included retail grocery purchases from "mom and pop" retail grocery stores, convenience stores, and non-grocery stores such as department stores, gasoline service stations, eating and drinking places, drug stores, and liquor stores. *Id.* The court credited evidence which showed that shoppers as well as the supermarkets themselves did not consider these other retailers as competition. *Id.* Thereafter, the court defined the relevant product market as the State had defined it. *Id.*

The Court is aware that litigants have not always been successful in proving submarkets similar to the one found by the Court in this case. *See Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369 (9th Cir.1989) (concluding that plaintiff failed to show that home centers were submarkets for purposes of its restraint of trade and monopolization claims). In addition, when the supermarket case went up on appeal, the Ninth Circuit did not set aside the relevant product market definition, but did express some reservations about it. *See State of California v. American Stores,* 872 F.2d 837, 841 (9th Cir. 1989) ("Were we to evaluate independently the evidence of the relevant product market, we might reach a different conclusion"). However, each of those cases is distinguishable on its facts. None, including *Bon–Ton,* possessed the compelling pricing evidence submitted to the Court in this case.

## IV. Probable Effect on Competition

After accepting the Commission's definition of the relevant product market, the Court next must consider the probable effect of a merger between Staples and Office Depot in the geographic markets previously identified. One way to do this is to examine the concentration statistics and HHIs within the geographic markets.[12] If the relevant product market is defined as the sale of consumable office supplies through office supply superstores, the HHIs in many of the

geographic markets are at problematic levels even before the merger. Currently, the least concentrated market is that of Grand Rapids–Muskegon–Holland, Michigan, with an HHI of 3,597, while the most concentrated is Washington, D.C. with an HHI of 6,944. In contrast, after a merger of Staples and Office Depot, the least concentrated area would be Kalamazoo–Battle Creek Michigan, with an HHI of 5,003, and many areas would have HHIs of 10,000. The average increase in HHI caused by the merger would be 2,715 points. The concentration statistics show that a merged Staples–Office Depot would have a dominant market share in 42 geographic markets across the country. The combined shares of Staples and Office Depot in the office superstore market would be 100% in 15 metropolitan areas. It is in these markets the post-merger HHI would be 10,-000. In 27 other metropolitan areas, where the number of office superstore competitors would drop from three to two, the post-merger market shares would range from 45% to 94%, with post-merger HHIs ranging from 5,003 to 9,049. Even the lowest of these HHIs indicates a "highly concentrated" market.

According to the Department of Justice Merger Guidelines, a market with an HHI of less than 1000 in "unconcentrated." An HHI between 1000 and 1800 indicates a "moderately concentrated" market, and any market with an HHI over 1800 qualifies as "highly concentrated." *See FTC v. PPG Indus., Inc.,* 798 F.2d 1500, 1503 (D.C.Cir.1986) (citing the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines) (hereinafter "Merger Guidelines"). Further, according to the *Merger Guidelines,* unless mitigated by other factors which lead to the conclusion that the merger is not likely to lessen competition, an increase in the HHI is excess of 50 points in a post-merger highly concentrated market may raise significant competitive concerns. In cases where the post-merger HHI is less

---

**12.** Market power or the lack of it is often determined by the Herfindahl–Hirschmann Index ("HHI"). The HHI is calculated by squaring the individual market shares of all the firms in the market and adding up the squares. The HHI takes into account the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size among those firms increases.

than 1,800, but greater than 1,000, the *Merger Guidelines* presume that a 100 point increase in the HHI is evidence that the merger will create or enhance market power. The *Merger Guidelines*, of course, are not binding on the Court, but, as this Circuit has stated, they do provide "a useful illustration of the application of the HHI," *Id.* at 1503 n. 4, and the Court will use that guidance here. In addition, though the Supreme Court has established that there is no fixed threshold at which an increase in market concentration triggers the antitrust laws, *see, e.g., United States v. Philadelphia National Bank,* 374 U.S. 321, 363–65, 83 S.Ct. 1715, 1741–43, 10 L.Ed.2d 915 (1963), this is clearly not a borderline case. The pre-merger markets are already in the "highly concentrated" range, and the post-merger HHIs show an average increase of 2,715 points. Therefore, the Court finds that the plaintiff's have shown a likelihood of success on the merits. With HHIs of this level, the Commission certainly has shown a "reasonable probability" that the proposed merger would have an anti-competitive effect.[13]

The HHI calculations and market concentration evidence, however, are not the only indications that a merger between Staples and Office Depot may substantially lessen competition. Much of the evidence already discussed with respect to defining the relevant product market also indicates that the merger would likely have an anti-competitive

effect. The evidence of the defendants' own current pricing practices, for example, shows that an office superstore chain facing no competition from other superstores has the ability to profitably raise prices for consumable office supplies above competitive levels. The fact that Staples and Office Depot both charge higher prices where they face no superstore competition demonstrates that an office superstore can raise prices above competitive levels. The evidence also shows that defendants also change their price zones when faced with entry of another office superstore, but do not do so for other retailers. Since prices are significantly lower in markets where Staples and Office Depot compete, eliminating this competition with one another would free the parties to charge higher prices in those markets, especially those in which the combined entity would be the sole office superstore. In addition, allowing the defendants to merge would eliminate significant future competition. Absent the merger, the firms are likely, and in fact have planned, to enter more of each other's markets, leading to a deconcentration of the market and, therefore, increased competition between the superstores.

In addition, direct evidence shows that by eliminating Staples' most significant, and in many markets only, rival, this merger would allow Staples to increase prices or otherwise maintain prices at an anti-competitive level.[14]

---

**13.** The Court is also persuaded by the Commission's HHI calculations for its alternate relevant product market, that of the sale of consumable office supplies through retail stores to small businesses and individuals with home offices. In response to the defendants' arguments regarding the variety of competition in this larger office supply market, the Commission presented HHI calculations which included additional competitors. Besides Staples, Office Depot, and OfficeMax, the Commission included Price Costco, Sam's Club, BJ's, Best Buy, Wal–Mart, Kmart, Target, Circuit City, Computer City, CompUSA, and independent office supply dealers in this alternate HHI calculation. The result showed Sacramento, California as the least concentrated market post-merger with an HHI of 1,793, and Greenville, North Carolina as the most concentrated market post-merger with an HHI of 5,047. Overall, the HHIs increased by an average of 861 points post-merger, an increase that is still problematic according to the *Merger Guidelines* given that all the post-merger markets were in the "moderately" or "highly concentrated" range.

Therefore, for this reason as well, the Court finds that the Commission has shown a "reasonable probability" that the merger would have an anti-competitive effect.

**14.** There has been tremendous argument regarding whether the FTC actually contends that prices will go up after the merger. The Court understands that is not precisely the Commission's contention. Rather, the Commission argues that the merger will have an anti-competitive effect such that the combined firm's prices will be higher after the merger than they would be absent the merger. This does not necessarily mean that prices would rise from the levels they are now. Instead, according to the Commission, prices would simply not decrease as much as they would have on their own absent the merger. It is only in this sense that the Commission has contended that prices would go up—prices would go up compared to where they would have been absent the merger. It is only in this sense that consumers would be faced with "higher"

The merger would eliminate significant head-to-head competition between the two lowest cost and lowest priced firms in the superstore market. Thus, the merger would result in the elimination of a particularly aggressive competitor in a highly concentrated market, a factor which is certainly an important consideration when analyzing possible anti-competitive effects. *See, e.g., FTC v. Food Town Stores, Inc.,* 539 F.2d 1339, 1345 (4th Cir.1976) (enjoining merger when merging firms had been "aggressive competitors in the past," by opening stores in each other's markets and increasing sales by greater than the industry's sales average). It is based on all of this evidence as well that the Court finds that the Commission has shown a likelihood of success on the merits and a "reasonable probability" that the proposed transaction will have an anti-competitive effect.

▮ By showing that the proposed transaction between Staples and Office Depot will lead to undue concentration in the market for consumable office supplies sold by office superstores in the geographic markets agreed upon by the parties, the Commission establishes a presumption that the transaction will substantially lessen competition. *See United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Once such a presumption has been established, the burden of producing evidence to rebut the presumption shifts to the defendants. *See, e.g., United States v. Marine Bancorporation,* 418 U.S. 602, 631, 94 S.Ct. 2856, 2874–75, 41 L.Ed.2d 978 (1974); *United States v. General Dynamics Corp.,* 415 U.S. 486, 496–504, 94 S.Ct. 1186, 1193–97, 39 L.Ed.2d 530 (1974). To meet this burden, the defendants must show that the market-share statistics give an inaccurate prediction of the proposed acquisition's probable effect on competition. *See United States v. Baker Hughes, Inc.,* 908

F.2d 981, 991 (D.C.Cir.1990) (rejecting argument that a defendant should be required to "clearly" disprove future anti-competitive effects, because that would impermissibly shift the ultimate burden of persuasion). *See also Marine Bancorporation,* 418 U.S. at 631, 94 S.Ct. at 2874–75 (finding presumption may be overcome by a showing that the statistics do not accurately reflect the probable effect of the proposed merger on competition). In order to rebut the FTC's showing with respect to the likely anti-competitive effects of a merger, defendants challenged the FTC's market-share statistics in this case in various ways, such as criticizing the Commission's definition of the relevant product market and introducing evidence to counter the FTC's pricing information. Defendants' also made allegations of "cherry-picking" on the part of the Commission, pointing to data which tend to show the opposite from the Commission's contentions. Finally, the defendants argued that the price differentials between one, two, and three firm markets shown by the Commission do not accurately reflect market power because the Commission failed to take into account factors such as the differences in marketing costs between stores.

▮ In their criticism of the Commission's pricing evidence, the defendants accused the FTC of "cherry-picking" its data and pointed to specific examples which contradict the Commission's conclusions. For example, the defendants focused on the FTC's comparison prices on manila folders in two Ohio towns, Columbus which has two superstores and Cincinnati which has all three superstore chains. For 1995–96, the prices of those manila folders were shown to be, on average, 51% higher in the two firm market than in the three firm market.[15] The defendants argued that in contrast to the Ohio example, a comparison of two Indiana towns, Kokomo with two firms and Elkhart/South Bend with all three firms, shows the opposite. In fact, the defendants' com-

---

prices. Therefore, when the Court discusses "raising" prices it is also with respect to raising prices with respect to where prices would have been absent the merger, not actually an increase from present price levels.

**15.** The FTC also presented comparison prices in Columbus and Cincinnati for perforated pads (86% higher in Columbus), envelopes (68% higher), computer paper (26% higher), hammermill paper (14% higher), and generic paper (12% higher).

parison of the average prices of manila folders for 1996 in Kokomo and Elkhart/South Bend shows that the prices in Kokomo, the two firm market, were 30% lower than in the three firm market.

The Court acknowledges that there is some evidence of this type in the record, and the Court has considered all of it. However, the fact that there may be some examples with respect to individual items in individual cities which contradict the FTC's evidence does not overly concern the Court. A few examples of isolated products simply cannot refute the power of the FTC's evidence with respect to the overall trend over time, which is that Staples' and Office Depot's prices are lowest in three firm markets and highest where they do not .compete with another office superstore. Neither does the fact that some two superstore areas have lower prices than some three firm markets. In addition, a closer examination of the price comparison study done by the defendants for Kokomo and Elkhart/South Bend shows that for four of the six products compared, the prices were actually higher in Kokomo.[16] Moreover, when Staples' total of price sensitive and non-price sensitive items are examined, Kokomo's prices are between 3 and 5% higher than Elkhart, which reconfirms the Commission's result rather than refuting it.

Defendants also argued that the regional price differences set forth in the FTC's pricing evidence do not reflect market power, because the reason for those differentials is not solely the presence or absence of other superstore competition. Instead, argued the defendants, these differentials are the result of a host of factors other than superstore competition. As examples of other factors which cause differences in pricing between geographic markets, the defendants offered sales volume, product mix, marketing or advertising costs, and distribution costs. Defendants also argued that there are differences in wages and rent which cause the differences in pricing between certain stores. The Court, however, cannot find that the evidence submitted by the defendants with respect to other reasons for the differences in pricing between one, two, and three firm markets is sufficient to rebut the Commission's evidence.

The Court generally accepts that per-store advertising costs, such as those incurred for a newspaper insert, will likely be lower in markets where Staples or Office Depot has a larger number of stores as those costs may be spread over a larger number of stores, and the defendants have provided some concrete evidence that the price differentials shown by the FTC may be somewhat affected by marketing costs. Donna Rosenberg, Vice President of Marketing Strategy at Staples, testified by declaration that Staples has the lowest average marketing costs per store in Staples/Office Depot areas and the highest marketing costs per store in Staples only areas. Exhibit H to her declaration shows, more specifically, that in 1996 Staples stores in three firm areas had an average marketing expense of 202,112. In Staples/Office Depot areas, Staples' stores had an average marketing expense of 185,905. Staples stores in Staples/OfficeMax areas paid an average of 218,500, and the stores in Staples only markets had an average marketing expense of 243,763. These numbers do suggest a correlation between the prices charged by Staples and marketing costs as average marketing costs are higher in the one firm markets than the three firm markets. However, the marketing cost evidence also shows that marketing costs are lower in Staples/Depot areas than in Staples/OfficeMax areas and, in fact, that costs are higher in Staples/OfficeMax areas than in the three firm markets, which does not correspond with the pricing trend. Staples generally charges lower prices where it competes with Office Depot than where it competes with OfficeMax and generally charges lower prices in three firm markets than in Staples/OfficeMax areas. In addition, the differences in marketing costs are not so large that they alone could account for the significant price differentials shown by the FTC.

---

**16.** The Defendants also paralleled the FTC's evidence with respect to perforated pads (8% lower in Kokomo), envelopes (5% higher), computer paper (8% higher), hammermill paper (1% higher), and generic paper (1% lower).

As the Court has already noted, the defendants, of course, point to other factors besides marketing costs. However, unlike the comparison of average marketing costs between one, two, and three firm markets, the defendants produced no concrete evidence in support of these other factors. For example, the Court believes that it is probably true that distribution costs are higher for stores which are the farthest from either company's distribution centers. Yet, the defendants introduced no evidence to show that the one firm markets are, in fact, the farthest from distribution centers or that in the three firm markets, the stores are the closest to the distribution centers. Nor did the defendants introduce any evidence showing the actual differences in distribution costs based on a store's distance from a distribution center. The only evidence that the Court heard on this point was the testimony of Thomas Stemberg, Chairman and CEO of Staples, who testified at the hearing that "typically the smaller markets are further away from the distribution hubs. It costs you a lot more to haul freight up to Bangor, Maine, than it does from Hagerstown to Washington." The Court cannot find that the FTC's pricing evidence is seriously undermined by such a general statement.

The defendants' evidence is similar with respect to sales volume, rent and wages. For example, Steven Mandel, Senior Managing Director of Tiger Management Corporation, testified at the hearing that single store markets are typically smaller markets. He continued by explaining that even though the costs of rent and labor may be lower in a smaller market, they would be higher as a percentage of sales because the volume of sales are also typically lower in these smaller markets. Therefore, in order to come out with a decent return on investment, it will be necessary to have a modestly higher gross margin in those markets. While this seems logical to the Court, again, the only evidence presented on the point is very general and the Court cannot give it much weight. For example, Mr. Mandel testified that "typically" one firm areas are in smaller markets but offered no concrete evidence relating specifically to Staples' or Office Depot's one firm market stores. Also, the Court has heard

evidence that Bangor, Maine, a one firm store in a smaller market, actually has an extremely high volume of sales which directly contradicts Mr. Mandel's testimony. Mr. Mandel is not employed by either Staples or Office Depot, and while he may be generally knowledgeable about the broader office supply industry, the Court questions his level of knowledge with respect to individual Staples and Office Depot stores. Finally, Mr. Mandel's testimony regarding the fact that he would generally expect higher gross margins in smaller one firm markets is contradicted by other evidence submitted by the defendants in their DX 1968 which states that in 1996, Staples' lowest gross margins were in the one superstore areas. For these reasons, the Court cannot find that the defendants' evidence regarding the different costs attributed to sales volume, rent, and wages shows that the Commission's evidence gives an inaccurate prediction of the proposed acquisition's probable effect on competition.

The defendants also argued that the variations in product mix between different stores account for some of the differences in prices between one, two, and three firm markets. For example, defendants argued that Staples' mix of general office supplies is highest in three superstore towns (37.29% of retail sales), lower in Staples/Office Depot areas (36.14%), lower yet in Staples/OfficeMax areas, and lowest in Staples-only areas (26.68%). On the other hand, defendants argue, computer mix is highest in Staples-only areas (30.36%), and lowest in three superstore areas (13.62%). Computer sales make up 40% of store sales in Bangor, Maine, for example, but only 10% in Los Angeles. Pointing to evidence showing that Staples' sale of computers in 1996 generated a net loss of 10.6%, defendants argued that stores with higher computer sales must have higher margins on their other products to generate sufficient total returns. Therefore, defendants explained that the higher prices of consumable office supplies in these areas are a result of economic costs and do not imply that Staples has more market power in Staples-only markets. The Court cannot agree. While the higher percentage of computer sales in a one firm market such as

Bangor, Maine, may be one of the reasons that Staples chooses to charge higher prices for consumable office supplies in that location, it does not change the fact that Staples is able to charge those higher prices. The primary reason that computer sales generate a very small or even negative return is the competition among sellers of computers. Individual competitors are effectively constrained from raising prices on computers. The fact that Staples can raise its prices for consumable office supplies in order to offset the low or negative returns on the sale of computers shows the opposite—that Staples is not constrained by non-superstore competitors from raising prices on consumable office supplies.

The above discussion covers some of the ways in which the defendants have challenged the FTC's market-share statistics in this case, including the highly debated issue of the relevant product market definition as well as the defendants' allegations of "cherry-picking" on the part of the Commission, and the defendants' argument that regional price differentials do not reflect market power because of the other factors such as marketing costs involved. However, in addition to attempting to discredit the Commission's evidence with respect to the combined company's market share and ability to raise prices, the defendants focused specifically on two other areas in an attempt to rebut the presumption that the proposed transaction will substantially lessen competition—entry into the market and efficiencies.

## V. Entry Into the Market

■ "The existence and significance of barriers to entry are frequently, of course, crucial considerations in a rebuttal analysis [because] [i]n the absence of significant barriers, a company probably cannot maintain supra-competitive pricing for any length of time." *Baker Hughes, Inc.,* 908 F.2d at 987. Thus, the Court must consider whether, in this case, "entry into the market would likely avert anticompetitive effects from [Staples'] acquisition of [Office Depot]." *Id.* at 989. If the defendants' evidence regarding entry showed that the Commission's market-share statistics give an incorrect prediction of the proposed acquisition's probable effect on competition because entry into the market would likely avert any anti-competitive effect by acting as a constraint on Staples–Office Depot's prices, the Court would deny the FTC's motion. The Court, however, cannot make such a finding in this case.

The defendants argued during the hearing and in their briefs that the rapid growth in overall office supply sales has encouraged and will continue to encourage expansion and entry. One reason for this, according to Dr. Hausman's declaration, is that entry is more attractive when an industry is growing, because new entrants can establish themselves without having to take all of their sales away from existing competitors. In addition, the defendants' impressive retailing expert, Professor Maurice Segall, testified at the hearing that there are "no barriers to entry in retailing," and defendants pointed to the fact that all office superstore entrants have entered within the last 11 years.

In addition to this general testimony regarding entry, defendants emphasized specific examples of recent or planned entry. For example, defendants offered testimony from John Ledecky, Chairman and CEO of U.S. Office Products, regarding U.S. Office Products' acquisition of Mailboxes, Etc., an acquisition that was coincidentally announced the night before Mr. Ledecky's testimony in this case. Through this acquisition, U.S. Office Products, an organization or co-op of approximately 165 contract stationers located throughout the country, will acquire the 3300-unit Mailboxes, Etc. franchise operation. Defendants also offered testimony regarding Wal–Mart's plans to revamp and expand the office supply section in its stores. According to the deposition testimony of William Long, Vice President for Merchandizing at Wal–Mart, and David Glass, President and CEO of Wal–Mart, Wal–Mart will modify its office supplies department, called "Department 3," beginning in May 1997 and continuing through the summer. Though Mr. Long was not certain of the exact number of SKUs of office supplies Wal–Mart's new Department 3 will offer, he estimated the range to

be 2,600 to 3,000 SKUs.[17] Finally, defendants offered testimony regarding the general ability of mass merchandisers, computer superstores, and warehouse clubs to change store configurations and shift shelf space to accommodate new demands or popular products.

There are problems with the defendants' evidence, however, that prevent the Court from finding in this case that entry into the market by new competitors or expansion into the market by existing firms would likely avert the anti-competitive effects from Staples' acquisition of Office Depot. For example, while it is true that all office superstore entrants have entered within the last 11 years, the recent trend for office superstores has actually been toward exiting the market rather than entering. Over the past few years, the number of office superstore chains has dramatically dropped from twenty-three to three. All but Staples, Office Depot, and OfficeMax have either closed or been acquired. The failed office superstore entrants include very large, well-known retail establishments such as Kmart, Montgomery Ward, Ames, and Zayres. A new office superstore would need to open a large number of stores nationally in order to achieve the purchasing and distribution economies of scale enjoyed by the three existing firms. Sunk costs would be extremely high. Economies of scale at the local level, such as in the costs of advertizing and distribution, would also be difficult for a new superstore entrant to achieve since the three existing firms have saturated many important local markets. For example, according to the defendants' own saturation analyses, Staples estimates that there is room for less than two additional superstores in the Washington, D.C. area and Office Depot estimates that there is room for only two more superstores in Tampa, Florida.

The Commission offered Office 1 as a specific example of the difficulty of entering the office superstore arena. Office 1 opened its first two stores in 1991. By the end of 1994, Office 1 had 17 stores, and grew to 35 stores operating in 11 Midwestern states as of October 11, 1996. As of that date, Office 1 was the fourth largest office supply superstore chain in the United States. Unfortunately, also as of that date, Office 1 filed for Chapter 11 bankruptcy protection. Brad Zenner, President of Office 1, testified through declaration, that Office 1 failed because it was severely undercapitalized in comparison with the industry leaders, Staples, Office Depot, and OfficeMax. In addition, Mr. Zenner testified that when the three leaders ultimately expanded into the smaller markets where Office 1 stores were located, they seriously undercut Office 1's retail prices and profit margins. Because Office 1 lacked the capitalization of the three leaders and lacked the economies of scale enjoyed by those competitors, Office 1 could not remain profitable.

For the reasons discussed above, the Court finds it extremely unlikely that a new office superstore will enter the market and thereby avert the anti-competitive effects from Staples' acquisition of Office Depot. The defendants, of course, focused their entry argument on more than just the entry of additional superstores, pointing also to the expansion of existing companies such as U.S. Office Products and Wal–Mart. The Court also finds it unlikely that the expansions by U.S. Office Products and Wal–Mart would avert the anti-competitive effects which would result from the merger.

The problems with the defendants' evidence regarding U.S. Office Products are numerous. In contrast to Staples and Office Depot, U.S. Office Products is a company which is focused on a contract stationers business servicing primarily the medium corporate segment. The Mailboxes stores recently acquired by U.S. Office Products carry only 50–200 SKUs of office supplies in stores of approximately 1,000–4,000 square feet with no more than half of that area devoted to consumable office supplies. In addition to their small size and limited number of SKUs, the Mailboxes stores would not actually be new entrants. U.S. Office Products is acquiring existing stores, and, besides Mr. Ledecky's plans to put a U.S. Office Products catalogue in every Mailboxes store, there was no testimony regarding plans to expand the

**17.** Redacted.

number of SKUs available in the retail stores themselves or to increase the size of the average Mailboxes store. Finally, though Mr. Ledecky testified that if Staples and Office Depot were to raise prices after the merger he would look on that as an opportunity to take business away from the combined entity, he later clarified that statement by explaining that he meant in the contract stationer field.

The defendants' evidence regarding Wal-Mart's expansion of Department 3 has similar weaknesses. While the total number of SKUs expected to be carried by the new Department 3 is impressive, Mr. Glass estimated it to be between 2,600 to 3,000 SKUs, the evidence shows that this is only an increase of approximately 400 SKUs. The Court has already found that Wal-Mart's sales of office supplies are outside the relevant product market in this case primarily because the pricing evidence shows that Wal-Mart does not presently effectively constrain the superstores' prices. The Court cannot conclude that an addition of 400 SKUs and reconfigured shelf space will significantly change Wal-Mart's ability to constrain Staples' and Office Depot's prices. The superstores will continue to offer significantly more SKUs of consumable office supplies. For these reasons, the Court cannot find that Wal-Mart's expansion through Department 3 is likely to avert anti-competitive effects resulting from Staples' acquisition of Office Depot.[18]

The defendants' final argument with respect to entry was that existing retailers such as Sam's Club, Kmart, and Best Buy have the capability to reallocate their shelf space to include additional SKUs of office supplies. While stores such as these certainly do have the power to reallocate shelf space, there is no evidence that they will in fact do this if a combined Staples-Office Depot were to raise prices by 5% following a merger. In fact, the evidence indicates that it is more likely that they would not. For example, even in the superstores' anti-competitive zones where either Staples or Office Depot does not compete with other superstores, no retailer has successfully expanded

its consumable office supplies to the extent that it constrains superstore pricing. Best Buy attempted such an expansion by creating an office supplies department in 1994, offering 2000 SKUs of office supplies, but found the expansion less profitable than hoped for and gave up after two years. For these reasons, the Court also cannot find that the ability of many sellers of office supplies to reconfigure shelf space and add SKUs of office supplies is likely to avert anti-competitive effects from Staples' acquisition of Office Depot. The Court will next consider the defendants' efficiencies defense.

## VI. Efficiencies

 Whether an efficiencies defense showing that the intended merger would create significant efficiencies in the relevant market, thereby offsetting any anti-competitive effects, may be used by a defendant to rebut the government's prima facie case is not entirely clear. The newly revised efficiencies section of the *Merger Guidelines* recognizes that, "mergers have the potential to generate significant efficiencies by permitting a better utilization of existing assets, enabling the combined firm to achieve lower costs in producing a given quality and quantity than either firm could have achieved without the proposed transaction." *See Merger Guidelines* § 4. This coincides with the view of some courts that "whether an acquisition would yield significant efficiencies in the relevant market is an important consideration in predicting whether the acquisition would substantially lessen competition.... [T]herefore, ... an efficiency defense to the government's prima facie case in section 7 challenges is appropriate in certain circumstances." *FTC v. University Health*, 938 F.2d 1206, 1222 (11th Cir.1991). The Supreme Court, however, in *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 579, 87 S.Ct. 1224, 1230, 18 L.Ed.2d 303 (1967), stated that "[p]ossible economics cannot be used as a defense to illegality in section 7 merger cases." There has been great disagreement regarding the meaning of this precedent and whether an efficiencies defense is permitted. *Compare RSR Corp. v. FTC*, 602 F.2d 1317,

18. Redacted.

1325 (9th Cir.1979) (finding that the efficiencies argument has been rejected repeatedly), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980) *with University Health,* 938 F.2d at 1222 (recognizing the defense). Neither the Commission or the defendants could point to a case in which this Circuit has spoken on the issue. *But see FTC v. Coca–Cola Co.,* 641 F.Supp. 1128, 1141 (D.D.C.1986) (Gesell) (finding that Congress recognized as desirable efficiencies that benefit consumers, but that they were to be "developed by dominant concerns using their brains, not their money by buying out troubling competitors. The Court has no authority to move in a direction neither Congress nor the Supreme Court has accepted"), *vacated as moot,* 829 F.2d 191 (D.C.Cir.1987). Assuming that it is a viable defense, however, the Court cannot find in this case that the defendants' efficiencies evidence rebuts the presumption that the merger may substantially lessen competition or shows that the Commission's evidence gives an inaccurate prediction of the proposed acquisition's probable effect.

The Court agrees with the defendants that where, as here, the merger has not yet been consummated, it is impossible to quantify precisely the efficiencies that it will generate. In addition, the Court recognizes a difference between efficiencies which are merely speculative and those which are based on a prediction backed by sound business judgment. Nor does the Court believe that the defendants must prove their efficiencies by "clear and convincing evidence" in order for those efficiencies to be considered by the Court. That would saddle Section 7 defendants with the nearly impossible task of rebutting a possibility with a certainty, a burden which was rejected in *United States v. Baker Hughes, Inc.,* 908 F.2d 981, 992 (D.C.Cir. 1990). Instead, like all rebuttal evidence in Section 7 cases, the defendants must simply rebut the presumption that the merger will substantially lessen competition by showing that the Commission's evidence gives an inaccurate prediction of the proposed acquisition's probable effect. *See id.* at 991. Defendants, however, must do this with credible evidence, and the Court with respect to this issue did not find the defendants' evidence to be credible.

Defendants' submitted an "Efficiencies Analysis" which predicated that the combined company would achieve savings of between $4.9 and $6.5 billion over the next five years. In addition, the defendants argued that the merger would also generate dynamic efficiencies. For example, defendants argued that as suppliers become more efficient due to their increased sales volume to the combined Staples–Office Depot, they would be able to lower prices to their other retailers. Moreover, defendants argued that two-thirds of the savings realized by the combined company would be passed along to consumers.

Evaluating credibility, as the Court must do, the Court credits the testimony and Report of the Commission's expert, David Painter, over the testimony and Efficiencies Study of the defendants' efficiencies witness, Shira Goodman, Senior Vice President of Integration at Staples. Mr. Painter's testimony was compelling, and the Court finds, based primarily on Mr. Painter's testimony, that the defendants' cost savings estimates are unreliable. First, the Court notes that the cost savings estimate of $4.947 billion over five years which was submitted to the Court exceeds by almost 500% the figures presented to the two Boards of Directors in September 1996, when the Boards approved the transaction. The cost savings claims submitted to the Court are also substantially greater than those represented in the defendants' Joint Proxy Statement/Prospectus "reflecting the best currently available estimate of management," and filed with the Securities and Exchange Commission on January 23, 1997, or referenced in the "fairness opinions" rendered by the defendants' investment bankers which are contained in the Proxy Statement.

The Court also finds that the defendants' projected "Base Case" savings of $5 billion are in large part unverified, or at least the defendants failed to produce the necessary documentation for verification. One example of this is the estimated cost savings from the Goods and Services category which projects cost savings of $553 million, about 10% of the

total cost savings attributed to the merger by the defendants. Ms. Goodman admitted that the entire backup, source, and the calculations of the Goods and Services' cost savings were not included in the Efficiencies Analysis. In addition, Ms. Goodman was unable to explain the methods used to calculate many of the cost savings. Similarly, the projected distribution cost savings, $883 million or 17% of the projected total cost savings, are problematic. Defendants' consultant A.T. Kearney estimated the savings, and Ms. Goodman admitted the Efficiency Analysis did not show that Kearney had deducted the projected Staples stand-alone savings from the new Hagerstown and Los Angeles full line distribution centers.

As with the failure to deduct the Staples stand-alone savings from the new Hagerstown and Los Angeles full line distribution centers from the projected distribution cost savings, the evidence shows that the defendants did not accurately calculate which projected cost savings were merger specific and which were, in fact, not related to the merger. For example, defendants' largest cost savings, over $2 billion or 40% of the total estimate, are projected as a result of their expectation of obtaining better prices from vendors. However, this figure was determined in relation to the cost savings enjoyed by Staples at the end of 1996 without considering the additional cost savings that Staples would have received in the future as a stand-alone company. Since Staples has continuously sought and achieved cost savings on its own, clearly the comparison that should have been made was between the projected future cost savings of Staples as a stand-alone company, not its past rate of savings, and the projected future cost savings of the combined company. Thus, the calculation in the Efficiencies Analysis included product cost savings that Staples and Office Depot would likely have realized without the merger. In fact, Mr. Painter testified that, by his calculation, 43% of the estimated savings are savings that Staples and Office Depot would likely have achieved as stand-alone entities.

There are additional examples of projected savings, such as the projected savings on employee health insurance, which are not merger specific, but the Court need not discuss every example here. However, in addition to the non-merger specific projected savings, Mr. Painter also revealed problems with the defendants' methodology in making some of the projections. For example, in calculating the projected cost savings from vendors, Staples estimated cost savings for a selected group of vendors, and then extrapolated these estimated savings to all other vendors. Mr. Painter testified that, although Hewlett Packard is Staples' single largest vendor, it was not one of the vendors used for the savings estimate. In addition, the evidence shows that Staples was not confident that it could improve its buying from Hewlett Packard. Yet, Staples' purchases and sales of Hewlett Packard products were included in the "all other" vendor group, and defendants, thereby, attributed cost savings in the amount of $207 million to Hewlett Packard even though Staples' personnel did not believe that they could, in fact, achieve cost savings from Hewlett Packard.

In addition to the problems that the Court has with the efficiencies estimates themselves, the Court also finds that the defendants' projected pass through rate—the amount of the projected savings that the combined company expects to pass on to customers in the form of lower prices—is unrealistic. The Court has no doubt that a portion of any efficiencies achieved through a merger of the defendants would be passed on to customers. Staples and Office Depot have a proven track record of achieving cost savings through efficiencies, and then passing those savings to customers in the form of lower prices. However, in this case the defendants have projected a pass through rate of two-thirds of the savings while the evidence shows that, historically, Staples has passed through only 15–17%. Based on the above evidence, the Court cannot find that the defendants have rebutted the presumption that the merger will substantially lessen competition by showing that, because of the efficiencies which will result from the merger, the Commission's evidence gives an inaccurate prediction of the proposed acquisition's probable effect. Therefore, the only remaining issue for the Court is the balancing of the equities.

## VII. The Equities

Where, as in this case, the Court finds that the Commission has established a likelihood of success on the merits, a presumption in favor of a preliminary injunction arises. *FTC v. PPG Indus., Inc.,* 798 F.2d 1500, 1507 (D.C.Cir.1986); *FTC v. Alliant Techsystems, Inc.,* 808 F.Supp. 9, 22–23 (D.D.C.1992). Despite this presumption, however, once the Court has determined the FTC's likelihood of success on the merits, it must still turn to and consider the equities. The D.C. Circuit has held that in cases such as the one now before the Court, a judge is obligated "to exercise independent judgment on the propriety of issuance of a temporary restraining order or preliminary injunction." *FTC v. Weyerhaeuser Co.,* 665 F.2d 1072, 1082 (D.C.Cir.1981) (quoting H.R.Rep. No. 624 at 31). "Independent judgment is not exercised when a court responds automatically to the agency's threshold showings. To exercise such judgment, the court must take genuine amount of 'the equities.'" *Id.*

There are two types of equities which the Court must consider in all Section 13(b) cases, private equities and public equities. In this case, the private equities include the interests of the shareholders and employees of Staples and Office Depot. The public equities are the interests of the public, either in having the merger go through or in preventing the merger. An analysis of the equities properly includes the potential benefits, both public and private, that may be lost by a merger blocking preliminary injunction. *Id.* at 1083. In addition, the Court notes that in balancing the equities, it is important to keep in mind that while private equities are important, "[w]hen the Commission demonstrates a likelihood of ultimate success, a counter showing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger." *Id.* at 1083. After examining the evidence in this case, the Court finds that in light of the public equities advanced by the plaintiff, the equities, both public and private, set forth by the defendants are insufficient to overcome the presumption in favor of granting a preliminary injunction.

The strong public interest in effective enforcement of the antitrust laws weighs heavily in favor of an injunction in this case, as does the need to preserve meaningful relief following a full administrative trial on the merits. "Unscrambling the eggs" after the fact is not a realistic option in this case. Both the plaintiff as well as the defendants introduced evidence regarding the combined company's post-merger plans, including the consolidation of warehouse and supply facilities in order to integrate the two distribution systems, the closing of 40 to 70 Office Depot and Staples stores, changing the name of the Office Depot stores, negotiating new contracts with manufacturers and suppliers, and, lastly, the consolidation of management which is likely to lead to the loss of employment for many of Office Depot's key personnel. As a result, the Court finds that it is extremely unlikely, if the Court denied the plaintiff's motion and the merger were to go through, that the merger could be effectively undone and the companies divided if the agency later found that the merger violated the antitrust laws. It would not simply be a matter of putting the old Office Depot signs back on the stores. Office Depot would have lost its name, many of its stores, its distribution centers, and key personnel. It would also be behind in future plans to open new stores and expand on its own.

More importantly, in addition to the practical difficulties in undoing the merger, consumers would be at risk of serious anticompetitive harm in the interim. Without an injunction, consumers in the 42 geographic markets where superstore competition would be eliminated or significantly reduced face the prospect of higher prices than they would have absent the merger. These higher charges could never be recouped even if the administrative proceeding resulted in a finding that the merger violated the antitrust laws. Failure to grant a preliminary injunction also would deny consumers the benefit of any new competition that would have occurred, absent the merger, between Staples and Office Depot as those stores continued to enter and compete in each other's markets. Both parties had aggressive expansion plans before the merger, many of which have been put on hold pending the outcome of this case.

The public equities raised by the defendants simply do not outweigh those offered by the FTC. In addition, given some of the Court's earlier findings, several of the public equities submitted by the defendants are without factual support. For example, the defendants argued that the public equities favor the merger because prices will fall for all products, in all markets, following the merger. Since the Court has already found that the Commission has shown a likelihood of success on the merits with respect to proving that the proposed merger will have anti-competitive effects, the Court cannot give any weight to this particular public equity advanced by the defendants. In addition, as the Court has previously explained, the fact that prices might be lower than current prices after the merger does not mean that the merger will not have an anti-competitive effect. Consumers would still be hurt if prices after the merger did not fall as far as they would have absent the merger. Similarly, the Court has already determined the defendants' efficiencies evidence to be unconvincing. On the public equities issue as it relates to efficiencies, Dr. Hausman testified that the merger will result in huge efficiencies to the U.S. economy, and that the cost savings realized as a result of those efficiencies will result in the creation of additional jobs. While the Court believes that there would be some efficiencies realized by the merger, though not at the level argued by the defendants, the Court cannot find that those efficiencies would result in the creation of so many additional jobs that the public equity would outweigh those argued by the plaintiff.

Finally, according to the defendants, the public equities also include the benefits consumers will derive from even greater product selection and the benefits the U.S. economy will derive from increased international trade as the combined company through its increased efficiencies and improved distribution system will be poised for a dramatic expansion into foreign markets. Defendants, however, have provided no specific evidence regarding the probable increase in product selection or the likelihood that a combined Staples–Office Depot will expand overseas. In addition, the Court is not convinced that

this is an appropriate equity which the Court may consider in this case. The Court, therefore, cannot find that the public equities regarding increased product selection for consumers and expansion into foreign markets overcome the public equities set forth by the FTC.

Turning finally to the private equities, the defendants have argued that the principal private equity at stake in this case is the loss to Office Depot shareholders who will likely lose a substantial portion of their investments if the merger is enjoined. The Court certainly agrees that Office Depot shareholders may be harmed, at least in the short term, if the Court granted the plaintiff's motion and enjoined the merger. This private equity alone, however, does not suffice to justify denial of a preliminary injunction.

The defendants have also argued that Office Depot itself has suffered a decline since the incipiency of this action. It is clear that Office Depot has lost key personnel, especially in its real estate department. This has hurt this year's projected store openings. The defendants argue, therefore, that Office Depot, as a separate company, will have difficulty competing if the merger is enjoined. While the Court recognizes that Office Depot has indeed been hurt or weakened as an independent stand-alone company, the damage is not irreparable. The evidence shows that Office Depot, which of the three superstores has been the low-priced aggressive maverick of the group, would continue generating sales volume and turning a substantial profit. In reaching this conclusion, the Court credits one of the defendants' own expert witnesses, Steven Mandel, who testified that, in his opinion, Office Depot would be fine even if the merger did not go through. He described Office Depot as a very strong and well-run company, and said that it would certainly have a little bit of a hole to dig out of if the merger were enjoined. However, his ultimate conclusion was that the company would recover. Certainly Office Depot is in a better position to recover and move forward now if the Court grants the plaintiff's motion than it would be if the merger was allowed to go forward and

then later the two companies were ordered to separate.

## CONCLUSION

Thomas Stemberg pioneered the office supply superstore concept in 1985. He created a deep discount chain selling a broad array of office supplies primarily to small businesses which theretofore were undeniably "paying through the nose" for office supplies. Staples was to be a high volume chain operating at low gross margins, with higher volume leading to still lower costs for consumers. Staples' pricing as well as the pricing of other office supply superstores which soon followed Staples' lead, revolutionized the office products industry, impacting all channels of office products retailing. By selling office products at 30 to 60% off list price, Staples and the other superstores worked as a catalyst that forced everyone else in the industry to focus on cutting their prices. In a relatively short period of time, the office supply superstores caused a general decrease in the price of office products across the board. That decrease continued as the superstores have increased their buying power, forcing manufacturers and suppliers to implement efficiencies in their own businesses in order to compete in the sale of their products.

In light of the undeniable benefits that Staples and Office Depot have brought to consumers, it is with regret that the Court reaches the decision that it must in this case. This decision will most likely kill the merger. The Court feels, to some extent, that the defendants are being punished for their own successes and for the benefits that they have brought to consumers. In effect, they have been hoisted with their own petards. *See* William Shakespeare, *Hamlet,* act 3, sc 4. In addition, the Court is concerned with the broader ramifications of this case. The superstore or "category killer" like office supply superstores are a fairly recent phenomenon and certainly not restricted to office supplies. There are a host of superstores or "category killers" in the United States today, covering such areas as pet supplies, home and garden products, bed, bath, and kitchen products, toys, music, books, and electronics.

Indeed, such "category killer" stores may be the way of retailing for the future. It remains to be seen if this case is *sui generis* or is the beginning of a new wave of FTC activism. For these reasons, the Court must emphasize that the ruling in this case is based strictly on the facts of this particular case, and should not be construed as this Court's recognition of general superstore relevant product markets.

Despite the Court's sympathy toward the plight of the defendants in this case, the Court finds that the Commission has shown a "reasonable probability" that the proposed merger between Staples and Office Depot may substantially impair competition and likewise has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instances and ultimately by the Court of Appeals." Therefore, the Court finds that the Commission has shown a likelihood that it will succeed in proving, after a full administrative trial on the merits, that the effect of the proposed merger between Staples and Office Depot "may be substantially to lessen competition" in violation of Section 7 of the Clayton Act. In addition, the Court has weighed the equities and finds that they tip in favor of granting a preliminary injunction. A preliminary injunction is, therefore, found to be in the public interest. The FTC's motion for a preliminary injunction shall be granted.

The Court once again commends counsel on both sides for their excellent performances in this matter and the tremendous efforts made on both sides. Though this was an extremely complex matter, the issues were clearly presented to the Court by counsel possessing superior advocacy skills. Counsel also exhibited a high degree of professionalism in their ability to resolve peripheral matters so that the Court could focus on the important issues presented by this action.

An appropriate order accompanies this Memorandum Opinion.